UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Dr. NADER KREIT,<br><br>Plaintiff,<br><br>-against-<br><br>BYBLOS BANK S.A.L.,<br><br>Defendants. | No. 1:22-CV-10751<br><br>Hon. Lewis J. Liman |

**DECLARATION OF FADI MOGHAIZEL**

I, Fadi Moghaizel, declare pursuant to 28 U.S.C. § 1746:

1. I am a Lebanese attorney, member of the Beirut Bar Association and senior partner of *Moghaizel Law Office*, a firm of 21 attorneys founded in 1953 by my late parents who were both lawyers. My legal education includes a *License en droit* from the Faculty of Law of Saint Joseph University, Beirut, in 1985, an LLM from the University of London, in 1986, and a PhD from the University of London, in 1991. I was admitted to the Beirut Bar and started practicing in 1985.

1

2.      Since 1985, my main practice areas include litigation, arbitration, contracts law, and banking law. My relevant experience includes representing local and foreign clients before Lebanese courts (civil and commercial chambers), whether as plaintiffs, defendants, or intervening third parties in more than two thousand lawsuits, including more than eight hundred and fifty lawsuits covering banking and financial activities. My litigation experience covers all stages of litigation, and comprises claims on the merits, attachments, injunctions, appeals to the Court of Appeal and Cassation Court, as well as enforcement of deeds and judgments. I have represented clients before all types and degrees of Lebanese courts. I have also been advising clients for more than thirty-five years in relation to issues of Lebanese contract law, banking law (including structuring, securing, and enforcing the settlement of banking facilities of all types), breach of contract, and validity of contracts. I have acted as counsel and arbitrator in institutional (ICSID, ICC, and several Arab arbitration centers) and *ad hoc* arbitration proceedings.

3.      I have acted as expert witness in foreign courts, including the High Court of Justice in London, the Paris (France) *Tribunal Judiciaire* and Appeal Court, Cypriot courts, Canadian courts, and various courts in the United States of America, as well as in arbitral tribunals. My clients include individuals, legal entities, governmental entities, and foreign governments. I am fluent in Arabic (bilingual proficiency), French (bilingual proficiency), and English (full professional proficiency), and for ease of the parties and the Court, I have prepared this Declaration in English.

4.      I submit this Declaration in opposition to the motion for attachment filed against *Byblos Bank S.AL.* ("**Byblos**" or the "**Bank**") by Dr. Nader Kreit ("**Plaintiff**"). The opinions expressed herein are based on my expertise as a practitioner as a Lebanese attorney.

5. For the purpose of this Declaration, I have reviewed scanned photocopies of the

   a. Complaint,

   b. Declaration of Plaintiff,

   c. Affirmation of Plaintiff's attorney Barry Janay,

   d. Plaintiff's Memorandum of Law, and

   e. The "Terms and Conditions for Opening and Operating a Bank Account" (the "**Terms and Conditions**").

6. My Declaration will cover the following issues:

   a. Jurisdiction of Lebanese courts.

   b. Availability and ability of Lebanese courts to hear the Plaintiffs' claims.

   c. Governing law.

   d. Legal status of bank deposits under Lebanese law.

   e. The conversion tort under Lebanese law.

   f. The fraudulent transfer tort under Lebanese law.

   g. The Bank's compliance with its contractual obligations.

   h. International transfer of funds under Lebanese law.

**A.      Jurisdiction of Lebanese Courts**

7. Under Lebanese law, free and valid consent is a key requirement for the formation of contracts, and more generally of all juridical acts. This principle arises from the tenets of the autonomy of the will and contractual freedom. It is in that context that Article 166 of the Lebanese Code of Obligations and Contracts ("**COC**") states that "*The law of contracts is governed by the principle of contractual freedom; individuals organize their legal*

3

*relationships as they wish, subject to the requirements of public policy, morality and taking into account statutory provisions that have a binding character.*" Article 176 of the COC adds that "*Any contract, and generally any agreement, has as its soul and body the parties' consent.*" It is also on the basis of such principle that the first paragraph of Article 221 of the COC lays down the fundamental and compelling universal rule of the binding force of contracts by stating that "*Agreements that have been validly made are binding for the parties.*"

8. It is pursuant to the above principles and rules that contractual choice of jurisdiction clauses is valid under Lebanese law and are given their full effect by Lebanese courts. Except for specific areas where Lebanese courts have exclusive jurisdiction as a matter of law (such as, for instance, in relation to commercial agency matters), the parties are free to decide whether to refer their disputes to local or foreign courts or to local or international arbitration.

9. It follows that, in the matter at hand, where the contract between the Plaintiff and Byblos includes a choice of jurisdiction clause requiring the Plaintiff to bring claims against Byblos exclusively in Lebanese courts, such clause must be given full effect, and Lebanese courts would have exclusive jurisdiction as a matter of contract and law.

10. The specific forum clause in the Plaintiff's agreement with Byblos which is contained in Clause 9.13 "Laws and Jurisdiction" of the Terms and Conditions states that "*Any dispute arising out of their execution and/or interpretation shall be exclusively referred to the Lebanese competent courts*."

11.     This contractual clause means unequivocally that any dispute initiated by the Plaintiff against the Bank concerning the parties' obligations and rights under the Agreement, such as this lawsuit, must be brought in Lebanese courts.

12.     Lebanese law also grants jurisdiction to Lebanese courts on the basis of domestic rules of territorial jurisdiction which apply in international law under Article 74 of the Lebanese Code of Civil Procedure ("**CCP**").[1] The rules governing domestic jurisdiction under Lebanese law are found in Article 97 of the CCP stating that *"Jurisdiction lies with the court of the defendant's domicile, except if provided otherwise by the law"*, and Article 100 of the same Code adding that *"In lawsuits related to civil or commercial contracts, jurisdiction lies with the actual or chosen domicile of the defendant, or the court of the place where the contract has been signed and where one of the main obligations arising from it [from the contract] is to be performed, or the court of the place where the contract must be performed entirely. The choice of domicile is enforceable against the parties' successors."*

13.     For the sake of completeness, I should say that Lebanese courts have jurisdiction to determine the Plaintiff's claims also on several alternative grounds that are (i) the place where the contract was signed,[2] (ii) the place where one of the main obligations arising from the contract is to be performed,[3] which is Lebanon where the Bank has the obligation to restitute the funds under Article 307 of the Lebanese Code of Commerce ("**LCC**") discussed further below, and (iii) the place where the disputed asset is located when the claim is served, which would also be Lebanon since the funds deposited with the Bank are located in Lebanon.[4] Moreover, Byblos is

---

[1] Article 74 of the CCP.
[2] Article 78(1) of the CCP.
[3] Article 78(1) of the CCP.
[4] Article 78(1) of the CCP.

5

domiciled in Lebanon and the Lebanese courts are the most convenient forum, as the applicable law is Lebanon's (as specified in Clause 9.13 of the Terms and Conditions cited above) and all the documents, witnesses, and other related elements of the claim are located in Lebanon.

14.     Under Article 101, paragraph 2, of the CCP, the courts of the place of Byblos' branch with which the Plaintiff dealt would also have jurisdiction to determine the Plaintiff's claims.

B.      **Availability and Ability of Lebanese Courts to Hear the Plaintiff's Claims**

15.     The Lebanese legal system follows the pattern of civil law legal systems. The Lebanese legal system is based on the predominance of codified bodies of laws, which comprise the Lebanese Constitution (1926), laws enacted by Parliament, governmental decrees, ministerial decisions, and orders and decisions issued by regulatory authorities.

16.     Courts in Lebanon have continued their activity in the regular course by adapting to the prevailing circumstances in Lebanon caused by COVID-19 and the financial situation. The Ministry of Justice and the High Council of Magistrates have managed to organize the work of Lebanese courts in a reasonably efficient manner. Such measures have enabled litigants to pursue their claims, to file lawsuits and pleadings, and courts have continued to use their best efforts in handling the cases submitted to them in an efficient manner.

17.     Courts are presently operating, and parties have access to courts in Beirut and other judicial districts of Lebanon.

18. After the outbreak of civil unrest and the financial crisis that followed in the fall of 2019, a significant number of Lebanese and foreign bank depositors who faced difficulties in transferring funds out of Lebanon filed lawsuits against Lebanese banks before Lebanese courts in Beirut and several other Lebanese judicial districts. Such lawsuits have been addressed timely and diligently by Lebanese courts. Lebanese courts in many instances ruled and held banks liable to their clients when they found that claims made by such clients were meritorious. There are presently a large number of such claims pending in courts in Lebanon whether in the First Instance or on Appeal.

19. To conclude on the issue discussed in this section, the Plaintiff has access to recourse in Lebanon with the application of Lebanese law. Certainly, as noted above, the courts of Lebanon are the most appropriate courts to interpret and apply Lebanese law affecting the parties hereto. The Lebanese courts constitute an even more convenient forum in light of the complex economic and financial crisis prevailing in Lebanon since October 2019. In my opinion, the Lebanese judiciary can and indeed would look objectively to claims of the parties and render the most appropriate judgment in this case and decide on the outcome of the dispute on hand.

C.  **Governing Law**

20. As with the jurisdiction clause covered above, it is by virtue of Articles 166, 176, and 221 of the COC, which embody the principles of contractual freedom and binding force of contracts, that the Plaintiff and Byblos must abide by the provisions of their agreements, which acknowledge that the agreements and the disputes arising out of them must be governed by Lebanese law.

21.     The agreement between the Plaintiff and Byblos expressly submits the contract and the relationship between the two parties to Lebanese law. Specifically, Section 9.13 of the Terms and Conditions says that "*The Terms and Conditions are governed by the Lebanese laws.*"

22.     For the sake of completeness, assuming that the Agreement had not specified the law governing the Agreements, Lebanese law would nevertheless be deemed the most convenient to be applied in accordance with the Lebanese conflicts of law rules on the grounds that (i) the agreement was signed in Beirut, (ii) the parties' main obligations are performed in Lebanon, (iii) the assets subject to these claims are located in Lebanon; and (iv) the Bank's domicile is located in Lebanon.[5]

**D.      Legal Status of Bank Deposits under Lebanese Law**

23.     Article 691 of the COC reads: "*When the subject matter of the deposit is a sum of money or other fungible things, and if the depositary has been authorized to use them, the contract is deemed as a loan for consumption.*" Hence, when the subject-matter of a deposit is a sum of money, as in the case at hand, and when the depositary can use the deposited funds, which is also the case of deposit-taking banks such as Byblos; the contract is considered to be a loan for consumption and not an investment. Bank deposits are thus considered by Lebanese law as loans due by the banks to their customers and not as investments.

---

[5] Emile Tyan, *Droit international privé*, pp. 283-286, Second Edition, 1974.

24. I have reviewed the agreement between the Plaintiff and Byblos. The terms of the Plaintiff's deposits are of the nature I describe above, in the sense that such deposits are debts and governed by the Terms and Conditions in terms of the parties' obligations with respect thereto.

### E. Byblos has complied with its Contractual Obligations

25. Byblos would comply with its contractual obligations when it makes the Plaintiff's funds available for withdrawal and use by banker's check drawn on the Central Bank of Lebanon (the "**CBL**"), or alternatively by domestic transfer.

26. I have not found any contractual term in the Terms and Conditions that lays down an obligation for Byblos to transfer the Plaintiff's funds abroad. Clearly, the Plaintiff has no international transfer right under the contract made with Byblos.

### F. The Conversion Tort under Lebanese Law

27. The conversion tort is not known under Lebanese law. The Plaintiff-Bank relationship is characterized by Lebanese law as a creditor-debtor relationship that is governed by the rules applicable to loans for consumption referred to above, and more specifically Article 307 of the LCC that establishes the repayment obligation of banks to their clients. Such obligation arises from the contract between the parties. It is a contractual obligation, not subject to separate duties or a tort claim such as conversion.

28. The contractual rights of depositors to be repaid are totally unrelated to the conversion tort as I understand it under New York law. Saying that there are conversion claims, in particular where the parties' contractual relationship is governed by Lebanese law, is simply wrong from the Lebanese legal viewpoint. Lebanese law does not recognize claims under tort for conversion, whether under such name or any other name under these circumstances.

**G.    The Fraudulent Transfer Tort under Lebanese Law**

29. Under Lebanese law, fraudulent transfer applies in general to payments made by a payor to a third party instead of making it to the lawful payee with the intent to defraud said party.

30. The Lebanese Penal Code embraces the definition of fraudulent conveyance under Lebanese law. Article 699 provides that "*A debtor who, in order to cause the loss of the rights of his creditors or prevent enforcement on his movable or immovable assets, reduces his assets in any form whatsoever and in particular by signing fictitious bonds or admitting falsely that he is bound by an obligation or that he settled it fully or partly, or who conceals part of his assets or smuggles them, or who sells some of his assets or destroys them or renders them defective, will be punished by imprisonment with labor from one month to six months and a fine from fifty thousand to six hundred thousand pounds.*"

31. Based on my review of the documents described above, I am not aware in this matter of actions that would fall under those enumerated by Article 699 of the Lebanese Penal Code. I am not aware of acts of disposition by the Bank whereby it intended to do away with its own assets so that the Plaintiff is not able to enforce his rights on the Bank's assets.

10

32. I note that, under Lebanese law, the concept of fraudulent bankruptcy requires actual and intentional fraudulent conduct, including intent to defraud someone of something, here money. Lebanon does not recognize strict liability or any form of "constructive" fraud in this context.

### H. International Transfers of Funds under Lebanese Law

33. Lebanese law does not define or regulate banks' international transfers of funds, and there is no statutory transfer right recognized for banks' customers.[6] Lebanese law does not obligate the bank to repay the funds standing on the credit of its client's account through such means of payment.[7]

34. Transfers, while common in international banking transactions, are subject nevertheless to the agreement of the parties, a bank's customer cannot claim a unilateral right to transfer funds to outside Lebanon. There is no international transfer right under Lebanese law.

35. It is essential to underline that, in addition to the right of the banks under Lebanese law to decline requests for international wire transfers, since November 2019, banks in Lebanon must refuse the processing of such requests due to a series of events and restrictions that I can summarize as follows:

---

[6] By "transfer right" I mean a right conferred on the customer to require the bank to perform a local or international transfer of funds, with the bank having no choice but to comply with the customer's instructions and perform the transfer of funds. A customer's transfer request must be made in writing and an oral request will not suffice.

[7] Except for post-2019 legislation imposing on banks to perform international transfer for Lebanese students' tuition overseas, capped at US $10,000. This supports my view that, absent agreement, there is no such transfer right or any statutory obligation for banks to transfer funds abroad outside the context of such legislation.

a.  While the country was already under serious economic stress, nationwide mass protests that started on October 17, 2019 triggered what has become a severe financial crisis creating concern that, in light of the prevailing panic, a rush by depositors to withdraw their funds deposited with the banks would provoke the collapse of the banking and financial system of the country. Many countries have faced similar crisis, with concerns of depositors about access to funds being significant. In those countries and presently in Lebanon, in order to prevent the irremediable collapse of the banking sector, in coordination with the regulatory authority in charge of ensuring the stability of the financial markets in the country, the **CBL**, all banks operating in the country adopted certain restrictive measures regarding transfers abroad and payments in cash above a certain limit in foreign currency.

b.  On November 17, 2019, the Association of Banks in Lebanon comprising all the banks operating in Lebanon, in coordination with the CBL, announced to the public a resolution for a rule of conduct and guidelines adopted by its members regarding restrictions on international transfers and payments in cash in foreign currency: Capped cash withdrawals, uncapped local transfers to accounts held at other banks in Lebanon, and uncapped payments in foreign currency by checks were and are still available at the present day.

c.  At the request of the Lebanese government, the CBL authorized the banks to use foreign currency funds held by them with their correspondents abroad only to cover the cost of import of basic important and necessary commodities for the benefit of the population, subsidized largely by the government, such as oil, gas, wheat, and essential food products, in addition to basic medicines and medical supplies.[15]

      d.      In Intermediate Decision no. 13187 dated January 30, 2020, the CBL further mandated that payment of the principal and interest of bonds and other financial instruments issued by Lebanese banks and deposited with a Lebanese custodian be made only at banks operating in Lebanon.

      e.      Thereafter, liquidity concerns became yet more acute when, in early March 2020, Lebanon defaulted on its sovereign debt for the first time in its history. My understanding is that Lebanese banks held a substantial part of such debt,[16] and the default significantly affected the value of such holdings.

      f.      As additional evidence of the very limited availability of foreign currency funds in Lebanon, the CBL issued on August 19, 2020 Basic Decision no. 13257 laying down an obligation for banks to perform international transfers to educational institutions abroad in payment of tuition for Lebanese students enrolled in foreign institutions of higher education, up to a ceiling not exceeding US $ 10,000 per (or for a) year. Subsequently, Lebanese Parliament passed two laws requesting that banks make payment by international transfers, for one time only, of US $ 10,000 for the benefit of each Lebanese student registered in universities and high institutes of education abroad.

36.      The above measures prescribing the restricted use of the limited foreign currency funds available in Lebanon aimed at preventing the irremediable collapse of the banking sector and the Lebanese economy. As indicated above, such measures are implemented by other countries facing similar financial crisis, like presently Argentina and Greece.

37. The above circumstances constitute valid grounds for banks to decline requests for international transfers by their clients, except as prescribed by statutes and decisions of the CBL.

38. The Lebanese government is in the process of working on a plan for restructuring and rescheduling Lebanon's foreign currency debts and is engaged into negotiations with Lebanon's foreign and local lenders, as well as international financial institutions, namely the *International Monetary Fund*, for a potential bailout program. On April 7, 2022, the *International Monetary Fund* reached a staff-level agreement with Lebanon for a four-year extended facility that will get full approval from the Fund once Lebanon enacts a series of reforms.

39. I conclude that, based on all the above, the Bank, in accordance with the provisions of Lebanese law, has acted properly in not complying with any request of the Plaintiff to effect international transfers of USD. As a result, refraining from performing such transfers is not a breach of the Bank's obligations under the Agreement and under Lebanese law.

**Conclusion**

**Based on the above, I am of the opinion that, under Lebanese law:**

a. Choice of governing law clauses and choice of jurisdiction clauses can be freely agreed between the Plaintiff and the Bank, and such clauses are valid and enforceable in accordance with their terms.

    b. Based on my review of the parties' agreement, I am of the opinion that such agreement is governed by Lebanese law and, as a matter of Lebanese law, based on the forum selection clause contained in the Terms and Conditions and principles of Lebanese law as described above, Plaintiff is required to bring his claims in the courts located in Lebanon.

    c. Lebanese courts remain available and are able to hear the Plaintiff's claims efficiently and independently as it presently occurs.

    d. The Bank has not breached its agreement with the Plaintiff and has complied with its contractual obligations.

    e. There is no conversion tort under Lebanese law.

    f. The fraudulent transfer tort under Lebanese law does not apply in the matter at hand.

    g. The Bank has no obligation under Lebanese law to perform international transfers for the account of the Plaintiff for the reasons described above.

**<u>Final Considerations</u>**

    a. The opinions expressed in this Declaration are limited to matters of the laws of Lebanon. I express no opinion with respect to the laws of any other jurisdiction, and it is assumed that no law of any other jurisdiction affects the conclusions in this Declaration.

    b. This Declaration is given in light of the laws of Lebanon presently in force, as implemented by Lebanese courts. The opinions in the Declaration may vary if the laws were to be amended, repealed, or annulled, or applied differently by Lebanese court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Beirut, Lebanon

February 3, 2023