UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Dr. NADER KREIT,<br><br>                          Plaintiff,<br><br>            -against-<br><br>BYBLOS BANK S.A.L.,<br><br>                          Defendants. | No. 1:22-CV-10751<br><br>Hon. Lewis J. Liman |

## DECLARATION OF MAKRAM SADER

I, Makram Sader, declare pursuant to 28 U.S.C. § 1746:

1. I submit this declaration in support of Defendant Byblos Bank, S.A.L. (the "Bank") in opposition to Plaintiff's motion for attachment (the "Motion").

2. I am a native Arabic and French speaker and fluent in English, and for ease of the parties and the Court, I prepared this declaration in English.

3. As of March 31, 2022, I retired after having been employed by and having served since 1991 as the Secretary General of the Association of Banks in Lebanon ("ABL").

   i. I am submitting this declaration in my personal capacity.

   ii. I hold a PhD in Economics from the University of Grenoble in France (1979).

   iii. I served as Professor of Economics at the State Lebanese University (1985-1991).

   iv. I am familiar with the banking laws, regulations, and practices of the banking sector in Lebanon.

   v. I have been closely involved since 2019, through various Parliamentary, governmental, and banking commissions, in coordination with other

     independent consultants, in working on various alternatives for the resolution of the present financial crisis prevailing in the country and developing a recovery plan for the reorganization and restructuring of the Lebanese debt and the banking sector. I have also been involved with negotiations with the international lending community, including the International Monetary Fund (the "IMF"). I presently continue to serve as a consultant and participate from time to time in those meetings, based on my expertise in the fields of economics and banking.

  vi. Neither ABL nor I have any personal interest in this litigation, and I do not hold any equity in Byblos Bank.

  vii. My more detailed resume is attached hereto as **Exhibit A**.

4. I have been engaged to render an opinion regarding the presently prevailing situation of the economy of Lebanon, the imposed restrictions on the Lebanese banks to effect transfers abroad of funds in foreign currency, and the impact of any decision of a foreign court which would extend advantages to depositors who seek a remedy other than through the Lebanese court system.

5. For the purpose of this declaration, I have reviewed the Motion and supporting documents filed by Plaintiff in support of his motion to confirm the order of attachment (Dkt. No. 9).

## The Lebanese Financial Crisis and its Effect on the Banking System

6. For over 70 years, Lebanon was recognized as one of the most prominent regional banking centers in the world. However, in recent years the wheels of fortune have experienced a sharp turn, thus changing the landscape of the economy in the country. This occurred as a result of, and in correlation to, various regional political conflicts and severe economic depression, thus

triggering a sharp increase in poverty, leading to social unrest in one of the highest dollarized economies in the world. The resulting financial crisis created a run of depositors on the banking system in 2019, which carries a majority of its deposits in foreign currency, mainly US Dollars.

7. Subsequently and related to this crisis, in early 2020, the government defaulted on its foreign debt, including about $32 billion in Eurobonds denominated in US Dollars (the "Government Eurobonds"), which elevated the crisis and its adverse impact on the entire banking system. The Lebanese banks were holding approximately 40% of such Government Eurobonds. The market value of the Government Eurobonds dropped substantially. This put further stress on the banking sector as the banks could not have access to their large deposits in foreign currency, mainly in US Dollars, that they had placed with the Central Bank, which had imposed limitations and certain restrictions on transfers of such foreign denominated funds abroad, as is generally done in similar cases by countries in such financial crisis.

8. The situation that developed was unexpected, unprecedented and one the authorities continue to address through the consideration of various alternatives for a plan of reorganization and recovery aimed at negotiating the country's debt with foreign creditors and rescheduling or restructuring the same in an affordable manner that satisfies the requirements of the IMF and other international lenders that have expressed readiness to help and assist the country.

**Actions of the Lebanese Banks in Response**

9. Under the law (the Lebanese Code of Money and Credit), the Central Bank, which is the country's banking regulator, has full authority to regulate banking operational policies and to maintain the stability of the local financial markets, especially in times of acute crisis. In order to safeguard the national financial system and avoid the full collapse (bankruptcy) of the banking sector, the Central Bank declined to make funds available to banks for transfers abroad in late 2019, despite the large deposits that the banks held with the Central Bank. As a result of this

Central Bank policy, banks were unable to make transfers of funds abroad except for the limited and exceptional purposes imposed by the Central Bank, as described herein. Consequently, banks were forced to decline their customers' requests for the transfer of funds overseas in foreign currency out of the deposits held with the banks but were authorized to make such transfers within the country.

10. The banks' limitations on the transfer and use of funds under the guidance of and in coordination with the Central Bank are designed to safeguard all parties' interests, including depositors, until a restructuring and reorganization plan is in place. To that end, the banks operating in the country under the umbrella of the ABL, a not-for-profit organization representing the banking sector in Lebanon, adopted a common resolution confirming said policy, applicable to all depositors, of restricting international transfers in coordination with the Central Bank.

11. Building off the Central Bank and ABL initiatives, in April 2020, the Lebanese Government through its Council of Ministers adopted a Financial Recovery Plan that committed to maintain the restrictions on international transfers introduced in November 2019 until the economic situation stabilized. The Financial Recovery Plan emphasized and further committed to efforts to implement and enforce these restrictions fairly and uniformly across all bank depositors.

12. In contrast to international foreign currency transfers, there are no restrictions on interbank transfers in foreign currency within Lebanon. Bank depositors still have full access to their funds within Lebanon. Banks have not declined the payment of such funds to customers in Lebanon through the formal local payment system of local clearance, including bankers' checks drawn on the Central Bank, with whom the banks had their largest deposits. Any transfer a depositor makes from an account at one bank to an account at another bank in Lebanon is fully available. I understand that many depositors of foreign currency in Lebanon have freely utilized

their funds for various transactions and investment purposes locally, including investing largely in real estate assets, for the settlement of debts, and for buying third-party credit risk without any restriction on the use of their funds at their discretion.

13. As indicated above, international transfers to accounts outside Lebanon have been allowed by the Central Bank only in certain exceptional, restricted and limited instances. These include payment for the import of materials for the interest of the Lebanese population as a whole, such as the import of basic commodities like fuel, medicine, food, etc., as requested by the Lebanese authorities and allowed by the Central Bank, which made funds available for those purposes. Additionally, while acknowledging the restrictions applied by banks on international transfers, Parliament enacted Law No. 193 in 2020, imposing on banks the duty to transfer, in foreign currency, for one year, up to $10,000 for the payment of tuition for Lebanese students studying abroad who are already enrolled in universities and whose parents have accounts with a bank. Similar limited exceptions were authorized in favor of individuals in cases of emergency, such the necessity for medical treatment abroad.

14. The present situation in Lebanon, as described above, is no different from that encountered by other developed countries in recent years, such as Greece, Cyprus, Argentina, Ecuador, and many others around the world. Most of them, after going through difficult conditions of restructuring their debts, have recovered and have come out of crisis. They all imposed similar restrictions on transfers of funds abroad in foreign currency during these periods of economic crisis.

15. Historically, the Lebanese banking sector has been the main driving force of the Lebanese economy and was recognized as a leader within the region. It has survived a number of challenges over the last 70 years, including civil war and many other major problems. Over the

years, the banking sector has enjoyed a quality reputation because of its sound banking, and it has always managed to operate in good standing, free of malpractice and corruption. To the best of my knowledge and contrary to what is being claimed by the Plaintiffs, the authorities, including the Government and the Central Bank, have been steadfast in adopting adequate policies restricting transfers to accounts outside of Lebanon except for the limited and exceptional circumstances described in paragraph 13 above. In the long run, I believe the country will survive this unprecedented financial and economic turbulence, and the banks will eventually regain their position if a successful bail out restructuring is carried out by the country's political establishment. It is worth noting that the Lebanese commercial banks have over $70 billion in deposits in foreign currency on the books of the Central Bank, and they are trying to work out a fair solution for all depositors, without any discrimination based on nationality or residency.

16. On April 14, 2022, the government adopted a preliminary recovery plan by the IMF, subject to further consideration. The plan will be submitted to the Parliament for approval. It is anticipated that the said proposal will be subject to amendments and modification after debate and review by the various parliamentary commissions. However, this could be seen as a first step in the right direction to the way out of the present financial crisis.

17. The Lebanese banks, including Byblos Bank, S.A.L, are bound to treat their customers equally and equitably (needless to say, under Lebanese law it is illegal to give preference to one creditor over another creditor, whether foreign or national, resident or non-resident). A large portion of the local population hold their life savings (small amounts, such as for retirees, teachers, low and middle level employees of the private or public sector) with the Lebanese banks, as they practically did not have the opportunity to have access to banks abroad, contrary to those residing abroad. All local or foreign depositors, either resident or non-resident, have taken the same inherent

and/or calculated risk by depositing their money in Lebanese banks, each for his or her own reasons and considerations, taking their own chances in assuming the "country risk" presented by the declining economic situation in Lebanon. A likely incentive was the high yield that the Lebanese emerging market was paying, and depositors were on notice of such risk based on local and international media coverage, as well as the financial statements and reports of international rating agencies, such as Fitch Ratings.

18. The banks have operated with a high degree of transparency. Their audited financial statements and balance sheets were and are at all times available to the customers, and they were published widely in the local media as well as on their websites. The state of the challenges of the country's economy were publicly known to all depositors through the various rating agencies and reports of international financial institutions such as the World Bank and the IMF. Unfortunately, the local small depositors with less than $100,000 in total deposits, representing their life savings, constitute the largest number of depositors living in the country (about 90%), including social security recipients, and they often did not have the means to shop around for banks outside of Lebanon. Despite all of these warnings, foreign or non-resident depositors, many of whom claimed to be sophisticated businessmen, took the challenge and the risk of the country, incentivized by the high interest rates that the banks were providing in Lebanon.

19. The banks remain keen on, and have a vested interest in, working through this crisis and rebuilding the economy of the country with the aim to restore confidence in the system. At the request of the Central Bank, and as a gesture of goodwill and trust in the future of the sector, the shareholders of the banks, who are directly negatively impacted by the situation in Lebanon, have recently agreed to increase their equity by 20% by injecting substantial new additional capital to meet the present challenges of the financial crisis.

20. Extending a special privilege of potentially recovering funds to those who are able to have access to foreign judicial forums will result in unfairly denying the equal and equitable rights of the local depositors in Lebanon, as well as depositors elsewhere, will contribute to the worsening conditions of the presently prevailing economic crisis of the country, and will constitute an impediment to its fair and equitable resolution. Challenges of the nature made in this lawsuit should be argued and resolved in Lebanon, in Lebanese courts, according to Lebanese law, where the interests and rights of all bank customers can be addressed equally and equitably.

21. I note discussions with IMF have been progressing and with the success of the May 2022 Lebanon parliamentary elections there is optimism that the current situation is hopefully moving towards a fair resolution of the crisis, which may take some time to be realized.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Beirut, Lebanon

February  6 , 2023

**Makram Sader**
signature:

# **<u>EXHIBIT A</u>**

# Dr. Makram Sader
# Curriculum Vitae

**Education**:

BS in Economics:   University of St. Joseph - Beirut (1974)
MS in Economics:   University of Grenoble - France (1977)
PhD in Economics:  University of Grenoble - France (1979)

**Professional Experience**:

- 1979-1985: Professor of Economics at the Lebanese University; researcher at CERMOC; authored several studies and publications on the Lebanese and Arab Economies.

- 1985-1991: Director of Research and Studies at the Union of Arab Banks. Advised on the Inter Arab Cooperation on banking issues.

- 1991-March 31, 2022: Secretary General of the Association of Banks in Lebanon. Involved in all aspects and issues concerning the activities of the banking sector and its relationship with the Government of Lebanon, the Central Bank of Lebanon and the various organizations of the financial and economic sectors; lead the efforts of the development of regulations, along highly recognized standards including AML/CFT in coordination with the US Department of Treasury and applied by the banks in Lebanon.

- April 1, 2002-Present: Independent Consultant on Economic and Financial Affairs.

**Other Professional Activities**:

- In 1998/99 Dr. Sader participated with his colleagues in the elaboration of the Lebanese Government Five Year (1999-2004) Financial Reform Program.

- The Lebanese authorities often consult Dr. Sader on many economic and financial issues.

- Dr. Sader's articles are regularly published in valued Lebanese medias, including
Annahar (Arabic), L'Orient Le Jour (French), Lebanon Opportunities (English).

- For more comprehensive view consult Google.

**Honorary Distinction**:

In 2019, French President Macron awarded Dr. Sader the prestigious Medal of Legion d'Honneur.

EAST\200150389.1